**HOLLEY, Appellant,**

v.

**WBNS 10TV, INC., Appellee.**

[Cite as *Holley v. WBNS 10TV, Inc.*, 149 Ohio App.3d 22, 2002-Ohio-4315.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 01AP–958

Decided Aug. 15, 2002.

Daniel S. Smith, for appellant.

Zeiger & Carpenter, John W. Zeiger, Marion H. Little, Jr., and Eva C. Gildee, for appellee.

---

McCormac, Judge.

{¶ 1} Plaintiff-appellant, Dennis Holley, appeals from a judgment of the Franklin County Court of Common Pleas granting the summary judgment motion of defendant-appellee, WBNS 10TV, Inc.

{¶ 2} The facts giving rise to this appeal are as follows: Plaintiff and Anika Manning are the natural parents of Chaz Holley, born May 7, 1997. Plaintiff and Manning have never been married. Plaintiff is employed as a real estate agent and has been involved with and supported Chaz since his birth. In 1999 and 2000, plaintiff and Manning had agreed upon a childcare schedule that called for plaintiff to care for Chaz on the weekends, as Manning worked weekends. Under

the agreed-upon schedule, plaintiff would pick Chaz up from daycare at "Downtown Playschool" on Thursday or Friday afternoon and would then care for Chaz until Monday morning, when he dropped him off at daycare. Plaintiff's pickup schedule varied every other week between Thursday and Friday because the childcare plan called for plaintiff to take Chaz to get his haircut every other Thursday.

{¶ 3} In 1999, plaintiff filed an action in which he sought to obtain legal custody of Chaz. In April 1999, a magistrate issued a decision recommending that a shared parenting plan proposed by plaintiff be adopted and that plaintiff be designated the custodial and residential parent of Chaz. However, the entry journalizing the magistrate's recommendation was not filed until May 10, 2000. In Ohio, an unwed mother is designated the child's sole residential parent and legal custodian by operation of law until a court issues an order designating someone else as the child's residential parent and legal custodian. R.C. 3109.042. Thus, until May 10, 2000, plaintiff's right to visitation with Chaz was subject to Manning's granting permission for such visitation.

{¶ 4} On Wednesday, April 26, 2000, Manning presented a notarized letter to Chaz's daycare instructing the daycare not to release Chaz into his father's custody. However, Manning allegedly failed to notify plaintiff of this change. When plaintiff arrived at Chaz's daycare to pick Chaz up on Thursday, May 4, 2000, the school released the boy to his father despite Manning's notarized letter. When Manning arrived at the preschool sometime later, she learned that plaintiff had already picked Chaz up. Later that evening, Manning telephoned WBNS 10TV, stating that her son's preschool had permitted plaintiff to pick up her son over her written instructions and that she had been unable to locate her son since that time. On May 5 and 6, 2000, WBNS 10TV broadcast a story during its newscasts which characterized plaintiff's conduct in picking Chaz up from preschool as an "abduction." The broadcast was as follows:

{¶ 5} "[**Anchor Angela Pace**]: He was just another little boy in a Columbus Day Care Center. But tonight two-year old Chaz Holley is a statistic . . . one of the two-thousand children abducted everyday in the United States. And this time, the daycare administrators admit it was their fault. New at 11, Penny Moore joins us with a mother's search for her missing son. Penny?

{¶ 6} "[**Reporter Penny Moore**]: Chaz Holley's mother was afraid the little boy would be snatched by his father, even though she has full custody. So she took the steps she was told would keep that from happening. But tonight she is alone and her new mission is finding Chaz.

{¶ 7} "Anika Manning thought her son was perfectly safe with the other children at this daycare . . . until she went to pick him up yesterday afternoon.

{¶ 8} "[**Mother, Anika Manning**]: I was looking for him and the teacher said Chaz is already gone.

{¶ 9} "[**Reporter Penny Moore**]: The daycare teacher had released Chaz to his father ... Dennis Holley ... in spite of this notarized letter in the file saying not to let the father pick him up under any circumstances.

{¶ 10} "[**Mother, Anika Manning**]: I told both teachers not to let them take him and then I talked to the director and did the paperwork.

{¶ 11} "[**Reporter Penny Moore**]: We asked the daycare administrators for an explanation.

{¶ 12} "[**Representative of Downtown Playschool**]: There was a miscommunication in the file and the teacher didn't have the letter and I assumed the teacher had the letter.

{¶ 13} "[**Reporter Penny Moore**]: Tonight, Chaz is nowhere to be found ... his father's apartment has been empty all evening ... he's had the phone number changed ... but late tonight ... Anika was able to reach him on his cell phone.

{¶ 14} "[**Mother, Anika Manning**]: You don't go to school and take him ... I always do that ... you knew you weren't allowed to pick him up.

{¶ 15} "[**Reporter Penny Moore**]: Dennis Holley wouldn't say where he has the boy.

{¶ 16} " And Ollie Hawes says the Downtown Playschool is no place for a child in the middle of a custody battle.

{¶ 17} "[**Representative of Downtown Playschool**]: We're not a police force we can't handle this ... find another center. We can't deal with a situation like this.

{¶ 18} "[**Reporter Penny Moore**]: Will Anika Manning find her son ... she is surprisingly optimistic.

{¶ 19} "[**Mother, Anika Manning**]: I know he doesn't want the responsibility of the child. He's just trying to spite me. He's just mad at me.

{¶ 20} "[**Anchor Tino Ramos**]: So why can't the police help find Chaz for his mother?

{¶ 21} "Because Columbus Police do not search for children in custody cases.

{¶ 22} "The mother must first locate Chaz, then police may ask the father to return him.

{¶ 23} "It is also up to the mother to file charges against the father. Anika Manning says she now plans to do that."

{¶ 24} On July 19, 2000, plaintiff filed a complaint against defendant in the Franklin County Court of Common Pleas alleging that he had been defamed by the news broadcast that indicated that he had abducted his son. On May 23, 2001, defendant moved for summary judgment on plaintiff's defamation claim. The trial court granted defendant's motion for summary judgment. Appellant appeals from the judgment of the trial court assigning the following errors:

### First Assignment of Error

{¶ 25} "The trial court committed prejudicial error in granting defendant's motion for summary judgment when genuine issues of material fact remain in dispute."

### Second Assignment of Error

{¶ 26} "The trial court erred in granting defendant's motion for summary judgment when it failed to construe the evidence most strongly in favor of the nonmoving party."

{¶ 27} We will address plaintiff's two assignments of error together, as both challenge the trial court's grant of summary judgment for defendant. Because this matter arises in the context of the trial court's grant of summary judgment pursuant to Civ.R. 56, we review the trial court's determination independently and without deference. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153. In conducting our review, we apply the same standard as the trial court. *Maust v. Bank One Columbus, N.A.* (1992), 83 Ohio App.3d 103, 107, 614 N.E.2d 765.

{¶ 28} In accordance with Civ.R. 56, summary judgment may be granted only if, viewing the evidence most strongly in favor of the nonmoving party, no genuine issue of fact exists, the moving party is entitled to judgment as a matter of law, and reasonable minds can only come to a conclusion which is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. A motion for summary judgment first forces the moving party to inform the court of the basis of the motion and to identify portions in the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 296, 662 N.E.2d 264. If the moving party makes that showing, the nonmoving party then must produce evidence on any issue for which the party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus (*Celotex Corp. v. Catrett* [1986], 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, approved and followed).

{¶ 29} In both of his assignments of error, plaintiff argues that the trial court erred in granting summary judgment for defendant on his defamation claim.

Defamation is the publication of a false statement of fact that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business. *Sweitzer v. Outlet Communications, Inc.* (1999), 133 Ohio App.3d 102, 108–111, 726 N.E.2d 1084. There are two forms of defamation: libel and slander. Generally, slander refers to spoken defamatory words and libel refers to written defamatory words. *Retterer v. Whirlpool Corp.* (1996), 111 Ohio App.3d 847, 857, 677 N.E.2d 417. However, the Restatement provides that a defamatory matter broadcast by means of radio or television is classified as libel. 3 Restatement of the Law 2d, Torts (1977), Section 568A. See *Perez v. Scripps–Howard Broadcasting Co.* (1988), 35 Ohio St.3d 215, 520 N.E.2d 198 (wherein the court used the term libel in referring to a defamation action arising out of a television news broadcast).

{¶ 30} In order to prevail on a claim for libel, it must be shown that (1) a false statement of fact was made concerning the plaintiff; (2) the statement was defamatory; (3) the statement was written and published, or broadcast by means of television or radio; and (4) in publishing or broadcasting the statement, the defendant acted with the necessary degree of fault. See *Sethi v. WFMJ Television, Inc.* (1999), 134 Ohio App.3d 796, 732 N.E.2d 451 (applying the traditional libel standard to a television broadcast). Where, as here, the plaintiff is a private person, Ohio law requires that the plaintiff establish by clear and convincing evidence that the defendant failed to act reasonably in attempting to discover the truth or falsity of the allegedly defamatory statement. *Lansdowne v. Beacon Journal Publishing Co.* (1987), 32 Ohio St.3d 176, 180, 512 N.E.2d 979.

{¶ 31} The trial court granted summary judgment for defendant based on its conclusion that the evidence submitted by the parties did not present a question of fact on the issue of fault, but, instead, established as a matter of law that defendant acted reasonably in attempting to discover the truth or falsity of Manning's report that plaintiff had abducted Chaz. Defendant contends that the trial court erred in reaching this conclusion because, in so doing, it failed to construe the evidence most strongly in his favor.

{¶ 32} Because we conclude that the innocent construction rule protects defendant from liability in this case, we do not reach the question of whether defendant acted reasonably in attempting to determine the truth or falsity of its story. The Ohio Supreme Court adopted the innocent construction rule in *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 372, 6 OBR 421, 453 N.E.2d 666. See *Sweitzer*, 133 Ohio App.3d at 112, 726 N.E.2d 1084 (indicating that *Yeager* has been so construed). The innocent construction rule is that, if a statement is reasonably susceptible of both a defamatory and an innocent meaning, the innocent meaning is to be adopted as a matter of law. *Yeager* at 372, 453 N.E.2d 666. "[A]n innocent construction requires a fair reading of the entire article

which gives the words their meaning. Isolated words * * * may not be taken out of context." *Crinkley v. Dow Jones & Co., Inc.* (1983), 119 Ill.App.3d 147, 152, 74 Ill.Dec. 636, 640, 456 N.E.2d 138, 142.

{¶ 33} It is clear that the term "abduction" may have a false and defamatory meaning in the present case. Defendant argues that the term necessarily connotes the commission of a crime similar to kidnapping. Even if this is not true, the term is susceptible of a meaning that makes defendant's broadcast defamatory. Webster's Ninth New Collegiate Dictionary (1988) 44, defines the term "abduct" to mean "to carry away by force." No one contends that defendant took Chaz from his daycare by force. Nonetheless, if the term "abduction" has an alternative meaning that renders defendant's broadcast true and, thus, not defamatory, plaintiff's cause of action must fail.

{¶ 34} The National Center for Missing and Exploited Children has defined the term "abducted child" to mean a "child who has been wrongfully taken, kept, or concealed." National Center for Missing and Exploited Children, Family Abduction: How to Prevent Abduction and What to Do If Your Child is Abducted (4th Ed.1994), at xi. The National Center for Missing and Exploited Children also defines the term "family abduction" as *"the taking,* keeping, or concealing *of a child by a parent,* other family member, or person acting on behalf of the parent or family member *which deprives another individual of his or her rights. Also called* parental kidnapping, child snatching, or *custodial interference."* (Emphasis added.) Id. In addition, at least two Ohio cases suggest that the term "abduction" is an appropriate term to use when referring to a noncustodial parent's improper exercise of custody over a child. *Stokes v. Meimaris* (1996), 111 Ohio App.3d 176, 189, 675 N.E.2d 1289 (police officer testified that it was appropriate to use the term "abduction" to describe a noncustodial parent's taking of a child); *In re Markham* (1990), 70 Ohio App.3d 841, 845, 592 N.E.2d 896 (court uses the term "abduction" to describe situation where one parent wrongfully takes custody of a child). In this case, although plaintiff does assert that he was not aware that Manning had withdrawn her permission for him to pick Chaz up from daycare, he does not dispute the fact that such permission had been withdrawn by virtue of Manning's notarized letter to the daycare facility. Because plaintiff was without permission to pick Chaz up at daycare, he had no right to custody of Chaz and his actions in exercising such custody were technically improper.

{¶ 35} Applying the innocent construction rule to defendant's story regarding plaintiff's abduction of his son, there is no genuine issue of fact but that the import of the story taken as a whole is that plaintiff obtained and exercised custody over the boy when he had no right to do so, rather than that plaintiff kidnapped or took the child by force. Because plaintiff did, in fact, pick up and

keep his son when he technically had no right to do so, the story aired by defendant was essentially true. Given that a reasonable innocent construction of defendant's story exists, that construction must be adopted as a matter of law. *Yeager,* 6 Ohio St.3d at 372, 453 N.E.2d 666; *Sweitzer,* 133 Ohio App.3d at 112, 726 N.E.2d 1084.

{¶ 36} Relying on the Third Appellate District's recent decision in *Gupta v. The Lima News* (2000), 139 Ohio App.3d 538, 547, 744 N.E.2d 1207, plaintiff argues that the question of whether an innocent or defamatory meaning of a statement is to be adopted is a question of fact which must be submitted to the jury. The discussion of the innocent construction rule in *Gupta* is dicta, as the court ultimately determined that no reasonable, innocent construction of the statement at issue in the case existed. However, to the extent that *Gupta* suggests that the innocent construction rule gives rise to a question of fact, rather than law, we believe the case was wrongly decided. In fact, a review of the authority relied upon in *Gupta* for the proposition that the innocent construction rule creates an issue of fact suggests that the *Gupta* court was confusing the innocent construction rule with the concept of "defamation per quod." See *Becker v. Toulmin* (1956), 165 Ohio St. 549, 556, 60 O.O. 502, 138 N.E.2d 391 (holding that, in an action for libel per quod, the question of whether a statement that is not defamatory on its face is nonetheless defamatory by innuendo is a question of fact).

{¶ 37} Because there is an innocent construction of defendant's broadcast about plaintiff's abduction of his son, defendant was entitled to summary judgment on plaintiff's claim that the story was defamatory.

{¶ 38} Plaintiff's first and second assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

TYACK, P.J., and PETREE, J., concur.

JOHN W. MCCORMAC, J., retired, of the Tenth Appellate District, was assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.